UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JCD, INC. d/b/a JCD MARKETING                    CIVIL ACTION

VERSUS                                            NO. 24-2489

HRI HOSPITALITY, LLC d/b/a ALOFT                 SECTION M (5)
NEW ORLEANS DOWNTOWN

## ORDER & REASONS

Before the Court is a motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure filed by defendant HRI Hospitality, LLC d/b/a Aloft New Orleans Downtown ("Aloft").[1] Plaintiff JCD, Inc. d/b/a JCD Marketing ("JCD") responds in opposition.[2] Aloft replies in further support of its motion,[3] JCD files a surreply in further opposition,[4] and Aloft responds to JCD's surreply.[5]  Having considered the parties' memoranda, the record, and the applicable law, the Court denies the motion.

## I.    BACKGROUND

This case arises out of a contract dispute.  JCD is a Georgia corporation that organizes tour packages for major sporting events.[6]  In November of 2022, JCD contracted with Aloft to reserve 25 rooms at Aloft's hotel in downtown New Orleans at a rate of $599.00 per night for February 6-10, 2025, in anticipation of the 2025 Super Bowl to be held in New Orleans on February 9, 2025.[7] JCD intended to "resell[] these rooms as the 2025 Super Bowl approached so that it could make a

---

[1] R. Doc. 9.
[2] R. Doc. 10.
[3] R. Doc. 13.
[4] R. Doc. 16.
[5] R. Doc. 19.
[6] R. Doc. 1 at 1, 3.
[7] R. Docs. 1 at 4; 9-2 at 2.

profit."[8]  JCD alleges that Aloft breached their contract when, after failing to charge two payments due under the contract "to JCD's credit card on file with Aloft despite JCD's explicit consent under the contract to do so," Aloft cancelled JCD's room block for "nonpayment" in September of 2024.[9]  On October 16, 2024, JCD filed its complaint with this Court pursuant to 28 U.S.C. § 1332, alleging that it "would have profited in excess of $75,000 if [it] had been able to utilize the Aloft room block for its 2025 Super Bowl tours and packages."[10]

## II.    PENDING MOTION

In its motion to dismiss, Aloft challenges this Court's diversity jurisdiction.  Aloft contends that § 1332's amount-in-controversy requirement has not been satisfied because JCD's complaint "fails to allege, much less prove, how or why it would have profited in excess of $75,000 … from a hotel room contract totaling only $69,703.80,"[11] which Aloft argues would be "highly implausible."[12]  Aloft also contends that JCD's complaint should be dismissed under Rule 12(b)(6) because "JCD, Inc. is not a party to the relevant contract."[13]  Aloft notes that "JCD Marketing" is the contracting party, and the email address listed for JCD on the contract has a "jcdmarketinginc.com" domain.[14]  Aloft contends that "JCD Marketing, Inc. is a distinct, active Georgia Domestic Profit Corporation"[15] and that "[JCD] has not alleged or demonstrated that it can do business under a name that corresponds to a separately registered[] business entity."[16]

---

[8] R. Doc. 10-1 at 5.
[9] R. Doc. 1 at 4-5 (quote at 5).
[10] *Id.* at 2.
[11] R. Doc. 9-2 at 6.
[12] *Id.* at 6-7 (quote at 6).
[13] *Id.* at 8.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 9.

In its opposition, JCD maintains that Aloft's alleged breach "caused JCD to lose over $75,000 in unrealized profits."[17] JCD attempts to demonstrate its unrealized profits using rates for rooms at Aloft and other New Orleans-area hotels for Super Bowl weekend that JCD "looked up" on October 16, 2024, the date it filed its complaint.[18] According to JCD, the contract rate was "less than half of the actual pricing for an Aloft room for four nights over the 2025 Super Bowl weekend as of the time the complaint was filed,"[19] such that, "even at the lowest retail price point available [on October 16] for an Aloft room for four nights during the 2025 Super Bowl weekend," JCD's expected profit would be "$84,251.20 for all 25 rooms."[20] JCD asserts that this "increased pricing of hotel rooms for the 2025 Super Bowl weekend is not unique to Aloft,"[21] and the accompanying declaration of its president and owner, J. Carey Dean, includes rates for eleven other hotels for Super Bowl weekend as of October 16, 2024.[22] JCD further argues that it "is owed the $17,425.95 deposit it paid," bringing the amount in controversy to "at least $100,000."[23]

In opposing Aloft's contention that JCD lacks standing to enforce the contract, JCD asserts that "JCD Marketing, not JCD Marketing, Inc., entered into the [c]ontract with Aloft,"[24] as "the party named [in the contract] is 'JCD Marketing,' one of the trade names of JCD, Inc.," which has been properly registered under Georgia law.[25] JCD further argues that "there is no prohibition against contracting under a trade name" under Louisiana law, and "Aloft's argument regarding JCD, Inc. doing business under the name of another business entity misses the mark because the … Georgia statute [Aloft cites] explicitly states that 'this chapter does not control the use of

---

[17] R. Doc. 10 at 4.
[18] *See id.* at 5-6; R. Doc. 10-1 at 5-6 (quote at 5).
[19] R. Doc. 10 at 4.
[20] *Id.* at 5.
[21] *Id.* at 4.
[22] R. Doc. 10-1 at 6.
[23] R. Doc. 10 at 5.
[24] *Id.* at 7.
[25] *Id.* at 9-10 (quote at 10); R. Docs. 10-3; 10-4.

fictitious or trade names.'"[26]  However, JCD requests leave to amend its complaint in the event that the Court determines that JCD is not the real party in interest.[27]

In its reply, Aloft again argues that JCD cannot satisfy the criteria for diversity jurisdiction because "speculative lost profits do not satisfy the $75,000 amount-in-controversy requirement."[28] Aloft contends that JCD's lost-profits calculation is speculative because it relies on purported rates of Aloft rooms as of October 16, 2024, and Aloft "had zero available rooms for February 6 through February 9, 2025," on that date,[29] and the Aloft listings relied upon by JCD are therefore from "unauthorized websites" that "do not guarantee listings, or bundle rooms with other event offerings."[30]  As for the rates of other hotels referenced by JCD, Aloft cites the declaration of Lior Sekler, the chief commercial officer of HRI Lodging (an Aloft affiliate), stating that JCD's assertion that "the Sheraton in Metairie was selling rooms for a rate of $23,296 … and that various other hotels also offered rooms for exorbitant prices" is "inaccurate" because, even assuming these hotels had availability, "the prices quoted are in the range of bundled packages … rather than prices of stand-alone hotel rooms."[31]  "To further illustrate the speculative nature of JCD, Inc.'s claimed prices for hotel rooms," Aloft references a 2024 report showing that the inflation-adjusted average daily rate for a hotel room in New Orleans during the weekend of the 2013 Super Bowl was $518.[32]  Aloft then argues that JCD "does not identify, much less explain, its costs and expenses" in its lost-profits calculation.[33]  Aloft also contends that JCD inflates its alleged lost profits by "double-count[ing] its initial deposit."[34]

---

[26] *Id.* at 10-11 (alteration omitted).
[27] *Id.* at 12.
[28] R. Doc. 13 at 3.
[29] *Id.* at 4 (emphasis omitted).
[30] *Id.* at 4-5.
[31] *Id.* at 6 (citing R. Doc. 13-1 at 4).
[32] *Id.* at 6-7.
[33] *Id.* at 7.
[34] *Id.* at 8.

Aloft then repeats its argument that JCD is not the proper plaintiff, asserting that "JCD Marketing, Inc. is a separate legal entity," and, "on the face of the contract, the only corporate entity identified is JCD Marketing, Inc. because that is the entity referenced in the domain name of the contact information."[35]  Lastly, Aloft argues that the Court should deny JCD's request to amend its complaint because "any amendment would be futile," as the complaint is subject to dismissal for failure to meet the amount-in-controversy requirement.[36]

In its surreply, JCD first contends that plaintiffs generally need not prove damages "with reasonable certainty" at the motion-to-dismiss stage, as this standard applies to the factfinder's determination of damages.[37]  JCD further asserts that Aloft "relies upon improper and inapplicable case law," and goes on to distinguish the cases cited in Aloft's reply.[38]  JCD then argues that whether rooms were or were not available at Aloft's hotel on October 16, 2024, is irrelevant to the determination of the amount in controversy, because JCD was using "the pricing of Aloft rooms, and the pricing of hotel rooms across the New Orleans metro area, [as] evidence of the pricing of hotel rooms on the market for the 2025 Super Bowl in New Orleans at the time the complaint was filed."[39]  JCD rejects the relevance of the 2024 report of 2013 data referenced by Aloft, arguing "that hotel room pricing in New Orleans for the 2025 Super Bowl is the highest that hotel room pricing has ever been for a Super Bowl" and "the average daily rate is just that, an average, and it does not accurately portray the rate for a hotel equivalent to Aloft."[40]  JCD also points out that "the average rate of $518 for a hotel room in 2013 is lower than the actual hotel room rate of $599 that JCD paid in 2022."[41]  JCD then argues that Aloft's "reliance on evidence from January 30, 2025

---

[35] *Id.* at 9.
[36] *Id.* at 10.
[37] R. Doc. 16 at 1.
[38] *Id.* at 1-4 (quote at 1).
[39] *Id.* at 4.
[40] *Id.*
[41] *Id.*

is inapplicable to the question of the pricing on October 16, 2024, the relevant date of inquiry."[42] JCD counters Aloft's objections to its lost-profits calculation, arguing that "[t]he net profit of reselling hotel rooms directly to consumers is simply the price of the resold hotel room minus the price paid," and that JCD need not demonstrate the existence of potential buyers at this stage.[43] JCD also contends that it did not double-count its deposit, which is a "separate and distinct item[] of recovery" from its lost profits.[44] Lastly, JCD highlights that, "most importantly and tellingly," Aloft "fails to mention 2025 hotel room pricing even once," and instead relies on rates from over 12 years ago.[45]

In response to JCD's surreply, Aloft clarifies its application of certain Fifth Circuit and federal district court cases,[46] asserts that lost profits cannot be based on conjecture under Louisiana law, even at the motion-to-dismiss stage,[47] and points out that "JCD has not provided evidence of the 'price' at which it would have resold the hotel rooms," relying instead on other hotels' purported rates.[48]

## III.    LAW & ANALYSIS

### A.  Legal Standard

#### 1.  Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to challenge a court's subject-matter jurisdiction.  "[A] claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory authority or constitutional power to adjudicate the claim."

---

[42] *Id.* at 5.
[43] *Id.*
[44] *Id.* at 5-6 (quote at 6).
[45] *Id.* at 6.
[46] R. Doc. 19 at 1-3.
[47] *Id.* at 3-4.
[48] *Id.* at 4 (emphasis omitted).

*Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018) (quotation omitted). The party asserting jurisdiction bears the burden of proving that subject-matter jurisdiction exists. *Id.* "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "A motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *Sureshot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 239 (5th Cir. 2018).

### 2. Rule 12(b)(6)

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The statement of the claim must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A pleading does not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (alteration omitted).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).   A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).   Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).   Thus, if the facts pleaded in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*.   The court "can choose to begin by identifying pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.   However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*   "'[The] task, then, is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012)).

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that

are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)).  A court may also take judicial notice of certain matters, including public records and government websites. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005).  Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### B.  Analysis

#### 1.  Amount in Controversy

Federal courts have original jurisdiction over matters involving state-law claims when the parties are completely diverse, meaning no plaintiff is a citizen of the same state as any defendant, and when the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1); *SXSW, L.L.C. v. Fed. Ins. Co.*, 83 F.4th 405, 407 (5th Cir. 2023).  "The amount in controversy is 'not proof of the amount the plaintiff will recover' but 'an estimate of the amount that will be put at issue in the course of the litigation.'" *Durbois v. Deutsche Bank Nat'l Tr. Co. as Tr. of Holders of AAMES Mortg. Inv. Tr. 20054 Mortg. Backed Notes*, 37 F.4th 1053, 1057 (5th Cir. 2022) (quoting *McPhail v. Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008)).  It "is measured by the direct pecuniary value of the right the plaintiff seeks to enforce or protect; stated somewhat differently, it is the value of the object or subject matter of the suit that is critical."  14B CHARLES ALAN WRIGHT, ARTHUR R.

MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3707, at 590 (5th ed. 2023); *see also Durbois*, 37 F.4th at 1057 (collecting cases).  "[T]he party invoking federal diversity jurisdiction … bears the burden of establishing the amount in controversy by a preponderance of the evidence." *Allstate Fire & Cas. Ins. Co. v. Love*, 71 F.4th 348, 351 (5th Cir. 2023) (citing *St. Paul Reins. Co. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998)).  If the amount in controversy is not apparent from the face of the complaint, the court may rely on summary-judgment type evidence. *Id.*; *see also* 14B WRIGHT & MILLER, *supra*, § 3705.  Summary-judgment type evidence includes "discovery material and post-institution or post-removal affidavits, exhibits, reports, declarations, emails, or letters, especially when the facts relating to jurisdiction are ambiguous or disputed" and is "often … material that was submitted on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." *Id.* at 518-32.  As a jurisdictional requirement, the amount in controversy "is decided under federal, not state, standards." *Id.* § 3702, at 323.  However, "to determine the nature and extent of the right the plaintiff is seeking to have enforced or protected," federal courts must "examin[e] the forum state's rules regarding the applicable measure of damages and the availability of special and punitive damages, as well as a right to attorneys' fees." *Id.* at 323-27.  Under Louisiana law, damages in a breach-of-contract action "are measured by the loss sustained by the obligee and the profit of which he has been deprived."  La. Civ. Code art. 1995.

JCD alleges in its complaint that it "would have profited in excess of $75,000 if [it] had been able to utilize the Aloft room block for its 2025 Super Bowl tours and packages."[49]  Thus, "the object of the litigation," *Durbois*, 37 F.4th at 1057, includes the profit JCD claims to have lost

---

[49] R. Doc. 1 at 2.

as a result of Aloft's cancelling the room block.[50]  Because JCD planned to "resell[] these rooms as the 2025 Super Bowl approached so that it could make a profit,"[51] it uses the rate listed for an Aloft hotel room (and also provides rates for other hotel rooms in the New Orleans area) for the weekend of the Super Bowl as of the day it filed its complaint to measure the rate at which it could have resold the rooms had the contract not been cancelled.  JCD asserts that, on the date it filed its complaint, "the lowest retail price point available for an Aloft hotel room for four nights during the 2025 Super Bowl weekend" was $6,154.20.[52]  JCD thus calculates its potential lost profits by subtracting its expenses – that is, the rate it would have paid for each room under the contract ($2,784.15, inclusive of taxes and fees) – from its revenue ($6,154.20), for a net profit of $3,370.05 per room, totaling $84,251.25 for all 25 rooms.[53]

Aloft rejects JCD's calculation of the amount in controversy as speculative because, it says, JCD has not shown that its calculations were "based on rooms actually available or for sale at the alleged prices."[54]  According to Aloft, it had no remaining rooms available for the weekend of the Super Bowl as of October 16, 2024, and the listings upon which JCD relies are "from unauthorized sites that do not offer or guarantee Aloft's actual hotel rooms at JCD, Inc.'s alleged prices."[55]  Regardless of the availability or unavailability of the rooms, the going rate for an Aloft room around October 16, 2024, would certainly be a reasonable measure for a lost-profits analysis.  However, JCD does not rely exclusively on Aloft's purported rates on October 16.  JCD provided rates for eleven other hotels, ranging from $4,895 to $23,296.80 per room.[56]  Most of these rates

---

[50] R. Doc. 1 at 9 ("JCD seeks and is entitled to a judgment against Aloft for its loss sustained, the profit of which it has been deprived, and all other damages that are a direct consequence of Aloft's failure to perform.").
[51] R. Doc. 10-1 at 5.
[52] R. Doc. 10 at 5.
[53] *Id.*
[54] R. Doc. 13 at 1 (emphasis omitted).
[55] *Id.* at 5.
[56] R. Doc. 10-1 at 5.

would yield a profit of more than $75,000 for 25 rooms after deducting a cost per room of $2,784.15.[57] Aloft's only attempt to refute these other rates is Sekler's assertion, "[b]ased on [his] understanding of room availability and rates," that the "exorbitant prices" listed are "inaccurate [because, e]ven if [those] rooms were available, the prices quoted are in the range of bundled packages … rather than stand-alone hotel rooms."[58]

Aloft also asserts that JCD's calculation "fails to establish net profits rather than gross revenue,"[59] by omitting JCD's "standard operating costs, including commissions to third-party resellers or booking platforms, credit card processing fees and transaction costs, customer service, marketing, and administrative costs, and potential cancellation risks or refunds."[60]  While a fuller breakdown of JCD's other expenses and intended resale prices would have been preferable, the inclusion of standard operating costs is unnecessary, as JCD is in the business of selling tour packages, not just reletting hotel rooms.  This suit concerns JCD's alleged lost profits on just one component of the tour packages, and its lost-profits calculation reflects its potential profit margin on that component, accounting for the largest and most pertinent expense – the cost per room under the contract (including taxes and fees).  And while "[JCD] has not provided any documentation demonstrating that it had customers for any rooms, identifying the intended buyers for the creation of bundled packages, explaining how those packages would have been formed, or specifying where they would have been sold,"[61] it is unclear how any of this information, aside from the existence of potential customers, is relevant in determining JCD's expected profit for the hotel rooms.  To

---

[57] Seven out of the eleven rates would result in a net profit of over $75,000 for 25 rooms.
[58] R. Doc. 13-1 at 4.  In so observing, Sekler only specifically identifies the $23,296 rate listed for the Sheraton, the highest rate on Dean's list.  This rate, as well as a rate of $20,920 for the Courtyard by Marriot, are clear outliers from the rest of the rates, which range from $4,895 to $11,224.00.  It is unclear which of the other rates Sekler deems "exorbitant," but even if these two highest rates are excluded, the majority of the remaining rates would still net over $75,000.
[59] R. Doc. 13 at 7.
[60] *Id.* at 8.
[61] *Id.*

demonstrate that the amount in controversy has been met, JCD only needs to show that, more likely than not, it could have resold the rooms at a rate sufficient to net a profit in an amount over $75,000, and Aloft's assertion that it had no available rooms remaining as of October 16 suggests that plenty of prospective buyers were willing to pay the going rate for a hotel room in New Orleans for Super Bowl weekend.

Aloft, relying on Louisiana law, also attacks the sufficiency of JCD's evidence. Aloft argues that "a claim based solely on the testimony of the injured party and unsubstantiated by other evidence does not constitute a reasonable certainty."[62] However, "[t]he determination of the matter in controversy for purposes of subject matter jurisdiction is a federal question and is decided under federal, not state, standards," 14B WRIGHT & MILLER, *supra*, § 3702, at 323, and federal courts use summary-judgment type evidence to determine whether the amount in controversy more likely than not exceeds $75,000. *Id.* § 3705; *Allstate*, 71 F.4th at 351-52. Signed declarations, like the one submitted by Dean, are competent summary-judgment evidence in the federal courts. *See* Fed. R. Civ. P. 56(c)(1). And preponderance of the evidence is the standard of proof.

JCD has produced summary-judgment type evidence of the market for hotel rooms in New Orleans for the weekend of the 2025 Super Bowl as of October 16, 2024, that clears this hurdle, showing that most hotel rooms were being sold at rates high enough for JCD to have profited at a sum in excess of $75,000 after deducting the contract price. Thus, on the record presented, the Court finds that JCD more likely than not would have had lost profits in an amount greater than $75,000. Whether Aloft had no availability on October 16 has no bearing on the listed rates, other than to demonstrate scarcity which tends to drive up prices. The average rate of a hotel room for the 2013 Super Bowl does not refute the 2025 rates reflected in Dean's declaration. And Sekler's

---

[62] *Id.* at 3 (emphasis omitted).

assertion that the "exorbitant" rates listed by Dean are "inaccurate," without more, is insufficient to rebut all of the quoted rates. Accordingly, JCD has satisfied its burden of establishing the amount in controversy by a preponderance of the evidence, and the Court has diversity jurisdiction over this action.

### 2. Real Party in Interest

Federal Rule of Civil Procedure 17 requires that an action "be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). Courts are to look to the law under which a corporation was organized to determine its capacity to sue and be sued. Fed. R. Civ. P. 17(b)(2). JCD is a Georgia corporation, formed on April 14, 1989, as JCD, Inc.[63] Aloft contends that JCD is not the "real party in interest" under Rule 17 because the party named in the contract is "JCD Marketing," which, Aloft says, corresponds to "a distinct, active Georgia Domestic Profit Corporation formed on April 6, 2015," as JCD Marketing, Inc.[64] And while JCD is identified as "doing business as JCD Marketing" in its complaint, Aloft argues that JCD has not demonstrated that it satisfies the criteria permitting a corporation to "do business under a name that corresponds to a separately registered[] business entity," under Georgia law.[65] However, as JCD points out, the Georgia statute cited by Aloft does not apply to trade names, Ga. Code § 14-2-401(e) ("This chapter does not control the use of fictitious or trade names. … Issuance of a corporate name does not affect the commercial availability of the name."), and "JCD Marketing" is a properly registered trade name of JCD, Inc.[66] Aloft does not dispute that JCD has registered "JCD Marketing" as a

---

[63] R. Doc. 10-2 at 1.
[64] R. Doc. 9 at 8.
[65] *Id.* at 9. Ga. Code § 14-2-401(b) prohibits use of a corporate name that is not "distinguishable upon the records of the Secretary of State from [t]he corporate name of a corporation incorporated or authorized to transact business in [Georgia]" unless one of the exceptions set out in that provision has been met.
[66] R. Docs. 10 at 9 (citing Ga. Code § 10-1-490 ("Every … domestic corporation using any name other than its corporate name [shall file in the office of the clerk of the superior court of the county] of its legal domicile, a registration statement ….")); 10-2; 10-3; 10-4.

trade name, nor does it contend that JCD is prohibited from contracting under a registered trade name. Rather, Aloft asserts that JCD fails to "explain why JCD Marketing, Inc. exists even though there was a preexisting trade name for JCD Marketing" – without itself explaining how the reason for one corporation's existence has any relevance to the determination of whether another corporation has contracted under a trade name – and that, "on the face of the contract, the only corporate entity identified is JCD Marketing, Inc. because that is the entity referenced in the domain name of the contact information for JCD."[67] However, Aloft cites no authority, and the Court has not found any, dictating that the use of a domain name is dispositive of the identity of a contracting party.

The party named in the contract is "JCD Marketing," a registered trade name of JCD.[68] Under both Georgia law and Louisiana law, a corporation may enter contracts under a registered trade name.[69] *See Savannah Oaks Condo. Ass'n, Inc. v. Waste Mgmt., Inc*., 2019 WL 1906271, at *5 (N.D. Ga. Feb. 15, 2019) ("[T]he Georgia Supreme Court has held that a corporation has the legal right to enter contracts under a registered trade name instead of its corporate name." (citing *In re Allison*, 481 S.E.2d 211, 216 n.11 (Ga. 1997))); *Websters Chalk Paint Powder, LLC v. Annie Sloan Interiors, Ltd*., 2014 WL 4093669, at *6 (N.D. Ga. Aug. 18, 2014) ("Louisiana law … permits a corporation to conduct business under an assumed name." (citing *MAS Nursing,* 523 So. 2d. at 912)); *La. Lift & Equip., Inc. v. Eizel*, 770 So. 2d 859, 863 (La. App. 2000) ("A contract

---

[67] R. Doc. 13 at 9.

[68] R. Docs. 10 at 9; 10-2; 10-3; 10-4.

[69] Louisiana law requires entities conducting business under a trade name to register that trade name in the city or parish in which they intend to conduct business. La. R.S. 51:281. Even if JCD has not registered "JCD Marketing" as a trade name in Louisiana, absent fraud, this would not render the contract unenforceable by JCD. *Haddad v. Elkhateeb*, 46 So. 3d 244, 250 (La. App. 2010) ("Even though a person who violates La. R.S. 51:281 may be fined and/or imprisoned, a party contracting with him may not use the fact of the violation of the statute as a defense to avoid payment pursuant to a contract. Accordingly, absent fraud or misrepresentation, which have not been alleged in the instant case, … [the contracting insurer] could not have avoided payment of the policy proceeds to [the insured] on the basis of a violation of La. R.S. 51:281." (internal citation omitted) (citing *MAS Nursing, Inc. v. Burke*, 523 So. 2d 909, 912 (La. App. 1988)).

entered into by a corporation, bearing only its assumed or trade name, is not for that reason deemed null and unenforceable.  Absent fraud or deceit, a corporation may contract under a name other than its corporate name.").  And under both Georgia law and Louisiana law, a corporation is entitled to enforce a contract entered under its trade name.  *See Colonial Oil Indus., Inc. v. Lynchar, Inc.*, 815 S.E.2d 917, 921 (Ga. 2018) ("It has repeatedly been held by the Court of Appeals that 'a trade name is merely a name assumed or used by a person recognized as a legal entity. ... An undertaking by an individual in a fictitious or trade name is the obligation of the individual.' Therefore, as a general matter, the use of a trade name does not shield the individual or entity using that name from the legal agreements into which that individual or entity enters." (alteration and internal citations omitted) (quoting *Auto-Owners Ins. Co. v. Tracy*, 806 S.E.2d 653, 656 (Ga. App. 2017)) (reversing holding by court of appeals that guaranties were unenforceable because they referenced only the trade name, not the legal name, of the corporate debtor); La. Code Civ. P. art. 687 ("A person who does business under a trade name shall sue in his own name to enforce a right created by or arising out of the doing of such business.").

Accordingly, JCD has sufficiently alleged that it contracted with Aloft under the trade name "JCD Marketing" and is therefore a "real party in interest" within the meaning of Rule 17. And even if the contracting party were, in fact, JCD Marketing, Inc. (which it is not), dismissal would be improper, as the Court would be required to permit JCD to amend its complaint to substitute JCD Marketing, Inc. in its place.  Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.").  Because JCD has carried its burden as to

16

the amount in controversy, such an amendment (had it been necessary) would not be "futile," as Aloft contends.[70]

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Aloft's motion to dismiss (R. Doc. 9) is DENIED.

New Orleans, Louisiana, this 20th day of February, 2025.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[70] R. Doc. 13 at 10.